# BALTIMORE CITY COURT.

Filed April 24, 1914

IN THE MATTER OF THE ESTATE
OF EBENEZER T. WHITE,
DECEASED.

ALEXANDER F. WHITE
VS.
MARTHA E. SNIDER AND FORREST
BRAMBLE, EXECUTORS, ETC.

*Wm. Colton* for plaintiff.
*Randolph Barton* and *Forrest Bramble* for defendants.

GORTER, J.—

Gentlemen, the issues which have been sent to this Court to try, by the Orphans' Court, are, first, the mental capacity of the testator; second, whether the will is executed according to law; third, whether undue influence was exercised over him; fourth, fraud; and fifth, whether he knew the contents.

At the close of the plaintiff's case the defendant has asked the Court to grant a prayer taking the case away from the jury upon the grounds that there is no evidence legally sufficient to support any of the issues that have been sent to this Court. It is not a question of discretion with me, whether I shall take the case away from the jury or let it go to the jury. I am as much controlled by a rule of law on that subject as a jury would be controlled by the rules of law in reaching a verdict. If there is no evidence of any of these issues legally sufficient to base a verdict on, then it becomes the bounden duty of the Court to take the case away from the jury and tell them to bring in a verdict for the defendant. If I did not do that, the Court of Appeals would do it, and all the extra work of staying here a number of days and trying the case, which would add to the expense of going there, would be incurred. Therefore, I am as much bound by a rule of law as you gentlemen would be.

Now, the main argument in this case is that this is an unjust will, that the provisions of the will indicate either that the testator did not have sufficient mental capacity to make it or that he was coerced and unduly influenced to make it, and while the justice or injustice of a will may be considered with other facts in determining on these issues, it is never alone held sufficient to justify the Court in letting the case go to the jury.

Most of the evidence that has been produced in this case has been for the purpose of showing that the will was unjust.

Let us first deal with that, because that is the keystone of the plaintiff's arch. Here was a gentleman of affairs who had lived a very useful, industrious life, a man of force and intelligence. He had, from his boyhood, taken care of his mother and she had lived with him until her death in 1906 when she was eighty years of age. He was the head of the motive power department of the B. & O. Railroad Company. After her death his youngest sister, with her husband, probably her children, I do not recall, came to live with him, and lived with him for a year or a year and a half, when she desired to leave, and she left and went to Virginia to live. Then, desiring to have some of his family with him, he had had his mother with him all of her life, and then he had had his sister, he sent for the nieces of a deceased sister and took them into his household and they lived with him until the time of his death which occurred the latter part of last year. That is the outline of the facts. Now, we have to consider whether or not with the family that he had and with his relationship to that family and to these young girls, his will was that which a man would naturally make, or whether it was that which a man would unnaturally make, and whether it was that which he would be justified in making.

First, as to his family: He had a brother, William, who had died before he died, who had left two daughters and a son. One daughter, Mrs. Thompson, formerly Mrs. Dempster, had mar-

ried unfortunately the first time and then married again. By her first husband she had a son. She was the testator's niece. He had educated that son; at least he had sent him four years to college; he had gotten him a position on the B. & O. Railroad, and he started him in life. His brother William had another daughter which they speak of here as Daisy White. She was married and had gone her way in the world. He had a son who is postmaster in some place, named George. I do not see what obligation he was under, to leave that branch of his family any of his money unless he desired to do so.

He had a brother, Alexander, who has been a witness here in the case, who is the caveator, a bachelor whom he had not seen for twenty-five years, who, if his testimony is true, had left thirteen hundred dollars with the testator which he had never needed. Therefore, he might have reasonably supposed he was well off anyway sufficiently to take care of himself. And I do not see what obligation he was under to that brother. He had a sister Mrs. Spears, who had four sons in Pennsylvania. If it is true that she was paralyzed the money could be of very little value to her. She had four able-bodied sons grown, one of whom testified in this case, and that son he had assisted and gotten a position in the B. & O. Railroad. I do not see that she needed anything or that he could have been of much service to her. He was not under any obligations to her. He had another sister in Indiana, Mrs. Weir, who had five children, he did not know how they got along, he had very little intercourse with them. None of them appear in this case. I do not see what obligation he was under to them, if he had any other obligations of a closer character. He had a sister, Mrs. Stephens. She had come down here, she had herself been called upon to come to the assistance of her mother. She was here when her mother died. She lived with him a year and a half. She could have lived with him all the rest of his life if she had wanted to. If she had, probably his affections would have turned more directly to her. People are apt to have affection for those who are around them, probably very much more than they are for those that are at a distance. She did not wish to do that.

He did not send her away. She left of her own accord. She wanted to own her own home. She wanted to go up in the country and live. Her husband was paralyzed. She wanted to get somewhere where he could get a little more freedom of action. She left voluntarily. If she had stayed, the chances are she would have been the beneficiary, for this man would not have known the nieces any better than he did the other numerous nephews and nieces he had. He did not treat her as if on her going away he was offended. He did a very unusual thing for a man worth forty or fifty thousand dollars to do. He gave her a house that he paid four thousand two hundred and fifty dollars for. He allowed her to have eighteen hundred dollars, which, I suppose, belonged to his mother that he had some control over, which made the total six thousand dollars. He did not stop there. He gave her four hundred dollars a year, thirty-three dollars a month, from that time until the time he died, seven or eight years. He probably, when he wrote his will, did not think he was going to die so soon. He probably would have continued to give her that money. Anyway he gave it to her until her son was twenty-three years of age, and her daughter had graduated from school. If you take what he gave her, what she got, six thousand dollars, if you take the interest on that up to the time he died, if you take the four hundred dollars he gave her, you will find that he has given her ten thousand dollars, he has given her almost her share in this estate. I think he intended to continue to give her money. He was a young man, he was only fifty-five years of age; that is, he was a young man to die. Therefore it seems to me that feeling he would continue to give her money he was not under any obligations to her. He had certainly done a brother's part by her, better certainly than almost any other brother would be expected to do.

Now then, on the other hand, we come to what he did next, when his sister, Mrs. Stephens, did not care to live any longer with him. He looked around for somebody and he asked the daughter of his deceased sister, Miss Ella Snider, to come and live with him. She did not rush there. She came and talked it over. She went back. She

waited six weeks and finished the work she had to do. Then she came and took up her abode with him, and her younger sister, ten years younger, came also. These two girls in the latter part of 1907 or 1908, came there and lived with him continuously up until the time that he died, evidently brightening and cheering his life. I say, with surroundings of that kind, what was natural for a man to do? His affections went out to these girls. They were the daughters of his sister who was dead. He manifested affection to all his brothers and sisters. These girls lived with him for five years. He had an income of forty-eight hundred dollars a year from his salary and about three thousand dollars income from his property, putting it at the figure that the inventory shows. Therefore he had an income of pretty close to eight thousand dollars. The time came when this man became sick, so sick that he had to give up his position; at least, he was allowed to stop his work and take a vacation on pay, and realizing that he was a sick man and realizing that these girls had been with him for five years and that 1815 West Baltimore street was their home, and that there would be no way for them to continue to live in that home unless he gave them his property, each of them fifteen hundred dollars a year, I say there is absolutely nothing more natural in the world, and I think he would have been a very unnatural man if, after those five years, during which they had given their life to him—these other people had had their lives, they had married and had children, the children grew up, all except one brother who did not marry. These girls had not had their lives. Every person has a right to his and her life. They gave their lives to him. He understood that and appreciated it and in the hour of his sickness they were there and they nursed him, and his heart went out to them, as any man's heart would go, not to them as nieces, but as daughters. From being his nieces they became his daughters. He did not want to turn them out of the home where they had lived with him. They traveled together. They brightened his life. He had had rather a serious life before they came there. Young people come into the lives of older people and brighten those lives. There was not anything else for him to do. It seems

to me if he had not done that he would have made a very unjust will. Therefore, when I start with that and consider it, I can not see that you can use the will for the purpose of showing that the man had influence exerted upon him which overcame his free agency, that it was the kind of influence that upsets a will, and I see no indication at all of a want of mental capacity or of a want of a sense of obligation. I think he did what almost any good man would have done. He left these girls in the home that they had made and not in as comfortable a position as if he had lived, but he left them all, left them to live in the home and keep it.

Therefore, the main point in the case, it seems to me, is gone, and the keystone is out of the arch. I want to say one thing, and that is that the evidence in this case reflecting upon the character of this man and of this young lady has made no impression on me at all. I think the suspicion is unfounded and preposterous. I think if you take the testimony as it is given, this young girl and this man, occupying the relation of a father, in the presence of her cousin who had come to see them, this young girl goes up to her uncle and kisses him and sits on his lap, you distort maybe the finest feeling in the world to what may be really a criminal thing, and I have no doubt that he did rather suggest that she would not do that in the presence of this young man, for a man of his knowledge would know that the minds of men are very much quicker to think impure things than the minds of good women. And therefore being partly a man of the world he may have thought, "Well, these boys will not understand that this girl is my daughter." She did it perfectly openly and before both of them upon every occasion. That is all. What is it? Nothing. But, when they come—I won't say unnaturally—and think that they have not been sufficiently recognized in this will, and come to distort something, a very fine feeling, the feeling that existed between this girl and her uncle, I am very sorry. Here was a man whose character was without a blemish, respected by everybody that knew him all of his life. And to have these two young men whom he had befriended to come here and cast that imputation upon him really is a very sad commentary on human nature.

When you come to the testimony of the colored girl. She lived there two years and a half. She absolutely saw nothing. If anything had been irregular in that house she would have seen it. When you ask her what she found she said she found two hairpins in his bed and she saw the young girl once when he was sleeping in the afternoon lying on the bed by him, and she testified he did not take his naps until after he ceased to go to the railroad company's office. Mr. Barton did not seem to catch that, but that is what her testimony was, and here is a sick man with hardening of the arteries, possibly having some premonition that he was in danger, lying home in the afternoon, which possibly he had never done before in his life, and here was the girl, almost, you might say, his child, his sister's child, going in there to lie by him. Could anybody put any wrong interpretation upon that? It seems to me it is going very far afield. When she was asked about it she stated that she was there attending him with a hot-water bag. He, I have no doubt, needed treatment and care and nursing. He had the trouble then which in a few months caused death, and when she went there she told the girl that she had put her toes in the bed where the hot-water bag was. It was not necessary for her to tell her that, but she just told her what happened. She was engaged in nursing him and doing what she ought to do.

So I wish to say on account of the kind of man he was, not that it has anything at all to do with this case or any of the issues in this case, but it is out of respect to him and her, and in order, as far as I can, to continue the good name which he so well deserved on account of his life and charity and kindness and industry and helpfulness to everybody, that I have said these things.

In addition to that, what is there to indicate a lack of mental capacity? Absolutely nothing at all.

When I looked at these cases to which I had been referred, the cases where the doctors themselves testified that the testators had not sufficient mental capacity, and the Court took the case away from the jury, and then look at this case, there is absolutely not a scintilla of evidence to indicate lack of mental capacity. When he wrote his will, which he did at his office, with those who knew him best to witness it, and his attorney present who read it, I believe his mental condition, so far as capacity to make a will is concerned, was as good as it ever was at any hour of his life. And there is not a particle of evidence to cast any doubt upon that. When you come to the question of whether it was executed according to law, of course, Mr. Colton brought out everything that it was possible to bring out, but these gentlemen never signed any other papers, and this was the paper referred to. I think nobody with any intelligence would have any doubt on that question, that it was executed according to law. When you come to the question of undue influence the same thing exactly applies. The whole case is built up on the injustice of the will. The defendant, Miss Ella Snider, was not present when it was made. The only evidence that she knew its contents is that she intimated she had a lot to do after the funeral. I suppose she did know the contents. I suppose when her uncle got sick he would naturally tell her, "I have provided for you girls, so that you can continue to live in this house; you do not have to start life again, you broke off when you had a foothold. I took that foothold away from you; you do not have to break away again and struggle; I am going to leave you here not as well provided for as you were when I was here, but as well provided for as I can leave you." There was no undue influence. Every influence that was exerted was a proper influence. She kept his bank account. She ought to; she ran his house. That she signed his name when his hand was paralyzed was very natural. It has been testified that she was boss of the house. She ought to have been. Every man that is worth anything has some woman around that is bossing him. If he has not he is more or less a cripple in life. There is absolutely no evidence of fraud, no misrepresentation of any kind or character in the case, and that he knew the contents of the will is presumed.

Therefore, gentlemen, I will grant the first prayer of defendants.

It, therefore, becomes my duty to instruct you to find your verdict for the defendant.

Mr. Barton: On all the issues?

The Court: On all the issues, and to answer the issues in the way that they will be called to you. You can take exceptions to the rulings of the Court.

Mr. Colton: We respectfully except, if your Honor pleases.

(Verdict taken.)

The Court: Mr. Barton, is there any objection to Mr. Colton's taking his exhibits out of Court?

Mr. Barton: No, with the understanding that Mr. Colton will keep them himself. Let him take them all, if he assumes responsibility for all of them.

Mr. Colton: Well, I will stand for them.